[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
CT Page 1038
When the marriage of the parties was dissolved on September 22, 1992, they agreed and the court ordered that the defendant, Mr. Paventy, pay unallocated alimony and support in the amount of $500 weekly. Their minor child, Jennifer, reached her majority on April 20, 1994, and both parties filed motions to modify the award of unallocated alimony and support later in 1994. For reasons not explained to the court the matter was not assigned for a hearing until September 1995, at which time the court heard evidence and argument on both motions.
It was stipulated by the parties that the court's decision on these motions would be retroactive to October 17, 1994, the date of the motion to modify filed by the plaintiff, Mrs. Paventy. All of the evidence introduced at the hearing on September 26 and October 5, 1995, however, related to the parties' financial condition at that time. The court has examined the file and found therein a financial affidavit of Mr. Paventy filed on October 4, 1994. That affidavit is substantially the same as the affidavit filed by him on September 26, 1995. The court also understands the testimony to have been that Mrs. Paventy's financial circumstances have not changed substantially since October 1994. Therefore, the court will assume that the parties intended the court to use the evidence and affidavits filed in connection with the hearings on these motions as well as the affidavit filed by Mr. Paventy in October 1994 in reaching its decision.
The court's responsibility in situations like the present one seems to have been settled by the Appellate Court's decision in Matles v. Matles, 8 Conn. App. 76 (1986).
 Inherent in an order of unallocated alimony and support is that some portion of the order is attributable to the payor's obligation to support the child. When the obligation to support the child no longer exists, it becomes appropriate for the trial court to reexamine the facts and circumstances of the parties as they exist at the time of such occurrence and to modify any such orders to reflect the changed circumstances. . . . Stated otherwise, where a court order by its very nature requires a modification to conform it to the jurisdiction of the court, that court, in making such modification, must be guided by the CT Page 1039 standard set forth in General Statutes § 46b-82. . . . Id., 79-80, 81-82.
Accord: Kolkmeyer v. Kolkmeyer, 18 Conn. App. 336, 341 (1989).
Section 46b-82 of the General Statutes sets forth the specific factors to be considered by the court in awarding alimony. This court has considered all of those factors alongside the present financial circumstances of the parties in fashioning a "new award". Id., 82.[1]
The overarching reality of these parties' lives, which the court must take into consideration, is the most unfortunate circumstance that all three of their children experience varying degrees of mental retardation. While no specific evidence of retardation was offered to the court, it is clear from the evidence that their sons, who are young adults, are, nevertheless, extremely dependent on Mrs. Paventy for their care and support. One of those sons, Kenneth, lives in the former family home with Mrs. Paventy, and the other son, Michael, has lived there since the time of the dissolution but for a short period during which he lived alone. At the time of the hearing in this matter Michael was intending to establish an independent residence again. The parties' daughter, Jennifer, is attending Findlay University, which was described by Mrs. Paventy as a college for persons with learning disabilities. Mr. Paventy testified that he did not consider Jennifer to be as handicapped as his sons.
Mrs. Paventy's only source of income at the present time is the unallocated alimony and support payments made by Mr. Paventy. While her weekly expenses as shown on her financial affidavit of September 26, 1995 may be overstated, they are not overstated by more than $100. The court finds that Mrs. Paventy requires an annual income of $45,000 to maintain the former family home in which she and the parties' son, Kenneth, presently reside.
Mrs. Paventy testified that she had made no efforts to seek employment since the dissolution. She is a high school graduate and received a travel agent's license in 1993 but has been unable to secure employment outside the home principally due to her sons' dependence upon her. The court believes that this situation will continue into the indefinite future. CT Page 1040
Mr. Paventy is president and half owner of a manufacturing company with gross sales of about $1,000,000 annually. He reports a net weekly income of just under $1,000 and weekly expenses of $1,225. His actual weekly living expenses, however, are significantly less than that amount.
When the unallocated alimony and support award of $500 is eliminated, as well as an amount of $230 which Mr. Paventy testified is his weekly cost of funding Jennifer's attendance at college, his actual living expenses weekly are $495. Moreover, Mr. Paventy testified that the amounts shown on his affidavit for rent and utilities are actually payments he makes to his girlfriend for his share of the cost of maintaining her residence, where they live together. When his weekly expenses are reduced by eliminating these amounts, they total $305.
In addition to his weekly living expenses Mr. Paventy is required by the terms of the judgment to pay at least $500 monthly on a home equity loan which is secured by the former family home. This obligation requires a weekly expenditure by him of $116 even though he claims on his financial affidavit of September 26, 1995 to be paying $277 weekly toward that obligation.
Mr. Paventy reports a net weekly income of $966. At the same time he testified that his brother, who owns the other half of the manufacturing business, and he control the business, and they decide together what salaries and expenses are to be paid. The court is aware of at least two occasions on which funds have been made available to him by the corporation over and above his regular salary. For example, one month after the dissolution and the entry of financial orders, the corporation repaid a loan of $25,000 to Mr. Paventy, and he used that repayment to aid in his purchase of a condominium, depositing the balance in a savings account. In 1994 the corporation paid him $11,000 on another loan, which amount he also deposited in a savings account.
The court concludes from the testimony at the hearing that, while the corporation is not an unlimited source of funds for Mr. Paventy, his reported net weekly income substantially understates the actual resources which are available to him by virtue of his position as president and half owner of the company. CT Page 1041
Mrs. Paventy receives on behalf of Kenneth financial assistance from the state and federal governments in the approximate amount of $251 per month, the weekly equivalent of which is $58. In addition, Kenneth works a part-time job at Stop Shop, which provides him and Mrs. Paventy with approximately $60 per week.
Mrs. Paventy received the former family home in the dissolution settlement. That residence includes an apartment which had been rented during the parties' marriage as well as a barn in which are located several stalls which are suitable for the boarding of horses. Two real estate agents testified at the hearing, and the court has relied on their testimony to estimate income which is available to Mrs. Paventy from the rental of the apartment and the horse-stalls. The court finds that, after the making of relatively minor repairs to the house and barn, the rental of the apartment and the horse stalls could generate approximately $12,000 per year as income for Mrs. Paventy. One of the real estate agents, the listing agent for the property, testified that the barn is in "pretty good" condition, needing no major repairs.
To summarize, the court has found Mrs. Paventy needs an annual income of approximately $45,000 to support herself in the former family home. The rental of the apartment and available horse stalls could generate $12,000 of that amount. In addition, income available by way of the financial assistance payable to her on behalf of Kenneth and his minimal wages at Stop Shop would make up an additional $6,000 of the needed income. The resulting deficiency is $27,000 annually, the weekly equivalent of which is $519.
The court finds, further, that Mr. Paventy has ample funds at his disposal to meet this need of Mrs. Paventy's. The court wishes to emphasize that this award is for the support of Mrs. Paventy. It is not child support in the guise of alimony, which is beyond the court's jurisdiction. This was a 24-year marriage when it was dissolved in 1992. While Mrs. Paventy's health seems to be good, and she has some vocational skills, her employability is severely limited due to the continued dependence of her sons and, in particular, Kenneth. These factors create a substantial need on her part for continuing support from Mr. Paventy, and the evidence received by the court demonstrates that he is able to meet that need. CT Page 1042
While commendable, Mr. Paventy's decision to support Jennifer at college cannot be considered by the court as a factor in determining his ability to meet his continuing obligation to support his former spouse. See Cariseo v.Cariseo, 190 Conn. 141, 143 (1983); Gould v. Gould, 1 Conn. App. 224
(1984).
Based on its consideration of the statutory factors and the analysis set forth above, the court enters the following orders:
1. The defendant's motion for modification of October 3, 1994 is granted and the unallocated alimony and support order of $500 weekly is terminated as of October 17, 1994.
2. The plaintiff's motion for modification of October 17, 1994 is granted, and the defendant is ordered to pay her alimony as follows:
 (1) Lump-sum alimony in an amount not to exceed $10,000, to cover the expense of repairs and renovations necessary to place the apartment and horse stalls in condition to be immediately rented. (2) Periodic alimony in the amount of $525 weekly, commencing October 17, 1994.
3. The court finds that an arrearage in the amount of $1,675 exists, representing the 66 weeks from the week including October 17, 1994 through the week including January 24, 1996 at the rate of $25 per week. That arrearage shall be paid by the defendant to the plaintiff within 30 days of the date of this order.
4. The periodic alimony payable pursuant to paragraph 2, above, shall be paid until the plaintiff dies or remarries.
5. The lump sum alimony payable pursuant to paragraph 2, above, shall be paid by the defendant within 30 days of his receipt of bills for the work done to repair and renovate the apartment and barn.
SHORTALL, J.